Jeffrey J. Hunt (5855)
Royce B. Covington (10160)
Rachel Lassig Wertheimer (13893)
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone:  (801) 532-7840
Facsimile:  (801) 532-7750
jhunt@parrbrown.com
rcovington@parrbrown.com
rwertheimer@parrbrown.com
*Attorneys for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| EAGLE AIR MED CORPORATION, a Utah Corporation, and VALLEY MED FLIGHT INC., a North Dakota Corporation,<br><br>Plaintiffs<br><br>vs.<br><br>SENTINEL AIR MEDICAL ALLIANCE, a Wyoming Limited Liability Company, JEFFREY FRAZIER, an individual, and DOES 1 through 10,<br><br>Defendants. | **FIRST AMENDED COMPLAINT**<br><br><br>Case No. 2:16-cv-00176-TC<br><br>Judge Tena Campbell |

Plaintiffs Eagle Air Med Corporation ("Eagle") and Valley Med Flight Inc. ("Valley")

hereby complain against Defendants Sentinel Air Medical Alliance ("Sentinel"), Jeffrey Frazier

("Frazier") and DOES 1 through 10, and allege as follows:

**PARTIES JURISDICTION AND VENUE**

1.      Eagle Air Med Corporation is a Utah corporation organized and existing under the laws of the State of Utah with its principal place of business in South Jordan, Utah.

2.      Valley Med Flight Inc. is a North Dakota corporation organized and existing under the laws of the State of North Dakota with its principal place of business in Grand Forks, North Dakota.

3.      Upon information and belief, Sentinel is a limited liability company organized and existing under the laws of the State of Wyoming, with its principal place of business in Cheyenne, Wyoming.  Upon information and belief, the sole members of Sentinel are Dirk Visser and Frazier.  Upon information and belief, Dirk Visser is an individual who is domiciled in and a citizen of Montana.  Upon information and belief, Frazier is an individual who is domiciled in and a citizen of Wyoming.  Upon information and belief, Frazier is and was at all times relevant to the claims alleged herein, an owner, manager, member, partner, and/or employee of Sentinel.

4.      Upon information and belief, DOES 1 through 10 are citizens of states other than Utah and North Dakota and are and were at all times relevant to the claims alleged herein, owners, managers, members, partners, and/or employees of Sentinel.

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because this action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      Personal jurisdiction exists over Sentinel and Frazier under the Utah Long-Arm Statute, Utah Code Ann. § 78-27-24, because they have transacted business within Utah,

contracted with a Utah corporation to supply services in Utah, and/or caused an injury to Eagle and Valley in Utah.

7.      Venue is proper in this district by virtue of 28 U.S.C. § 1391 because Sentinel and Frazier are subject to personal jurisdiction in this judicial district and a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

## GENERAL ALLEGATIONS

### Eagle and Valley Provided Medically Necessary Air Ambulance Services

8.      Eagle and Valley are providers of air medical services, specializing in the emergency care and transport of patients in medical need of such transportation from small rural area hospitals to larger care facilities in metropolitan areas.

9.      On or about December 13, 2013, Patient One was a patient at the Blue Mountain Medical Center located in Blanding, Utah where he was receiving treatment for pneumonia.

10.      Local medical facilities in Blanding were unable to adequately treat Patient One's serious medical condition and were ill-equipped to address his medical needs.

11.      Because of the serious nature of Patient One's medical condition, his treating physician determined that he should be medically transported from Blanding to the Medical Intensive Care Unit at the University of Utah Hospital in Salt Lake City, Utah, a higher level care facility better equipped to address his medical condition.

12.      Based on the distance between the medical facilities, and the seriousness of Patient One's medical condition, a medical transport aircraft from Eagle was summoned (at the request of Patient One's treating physician) and responded to the request to medivac transport Patient One to Salt Lake City, Utah.

13.     Patient One was safely transported via Eagle's aircraft to the University of Utah Hospital in Salt Lake City, Utah.

14.     On or about July 23, 2015, Patient Two was a patient at a healthcare facility located in Iron Mountain, Michigan.

15.     Local medical facilities in Iron Mountain were unable to adequately treat Patient Two's serious medical condition and were ill-equipped to address his medical needs.

16.     Because of the serious nature of Patient Two's medical condition, his treating physician determined that he should be medically transported from the healthcare facility in Iron Mountain to a higher level care facility better equipped to address his medical condition, located in Green Bay, Wisconsin.

17.     Based on the distance between the medical facilities, and the seriousness of Patient Two's medical condition, a medical transport aircraft from Valley was summoned (at the request of Patient Two's treating physician) and responded to the request to medivac transport Patient Two to Green Bay, Wisconsin.

18.     Patient Two was safely transported via Valley's aircraft to the higher level care facility in Green Bay, Wisconsin.

19.     In addition to Patients One and Two, Eagle and Valley have safely transported hundreds of other patients from medical facilities that were unable to adequately treat them to higher level care facilities better equipped to address their medical needs after the patients' treating physicians determined that such transportation was medically necessary and summoned Eagle and Valley for that purpose.

20.     Medical facilities providing emergency care must comply with the Emergency Medical Treatment and Active Labor Act ("EMTALA") and certain of EMTALA's implementing regulations—42 C.F.R. § 489.24.

21.     EMTALA is codified at 42 U.S.C. § 1395dd ("Statute").  The federal regulations which implement EMTALA are found at 42 C.F.R. § 489.24 ("Regulations").  The Regulations, while similar to the Statute, contain additional provisions relevant to the enforcement and interpretation of the Statute by Centers of Medicare and Medicaid Services ("CMS").

22.     CMS specifically mandates that it is "the treating physician at the transferring hospital who decides how the individual is transported to the recipient hospital and what transport service will be used, since this physician has assessed the individual personally.  The transferring hospital is required to arrange transport that minimizes the risk to the individual who is being transferred, in accordance with the requirements of §489.24[(e)(2)(iv)]."

23.     Patients One and Two, and other patients transported by Eagle and Valley, were dispatched pursuant to the protocols set forth under federal law, including the Statute and Regulations.  As a result, Eagle and Valley provided care and transport to Patients One and Two, and other patients, only after their treating physicians had determined that such transport was medically necessary and summoned Eagle and Valley for that purpose.

### The Plan Administrators Refused to Pay Eagle and Valley
### A Reasonable Amount for Services

24.     Prior to being transported by Eagle and Valley, patients usually sign a "Standard Ambulance Signature Form," which provides in relevant part:

> I have been advised of and consent to all treatment and transport rendered to me
> or my dependents by [Eagle/Valley], and agree to pay charges related to those
> services. I authorize the submission of a claim for payment and request that

payment of authorized Medicare, Medicaid or other insurance benefits to be made on my behalf directly to [Eagle/Valley]. I assign [Eagle/Valley] all right, title and interest in all benefit plans from which my dependents or I are entitled to recover and agree to immediately remit and assign any payment for the services provided to [Eagle/Valley]. I authorize and direct any holder of health information or other relevant documentation about me to release such information to [Eagle/Valley] and its' billing agents at their request, now, in the past, or in the future as deemed necessary by [Eagle/Valley]. I give permission for [Eagle/Valley] and its agents to release financial, medical and other information about me at their discretion, to whomever they deem appropriate for purposes of quality review, reimbursement and training, and understand that I am financially responsible for payment for this service including any deductible, coinsurance, or non-covered services or charges denied by an insurance carrier . . . .

25.    Accordingly, after completion of the medical transport, Eagle and Valley typically invoice each patient's respective insurance company for services rendered and did so in connection with each of the patients involved in this matter, including Patients One and Two.

26.    The patients involved in this matter, including Patients One and Two, are provided with healthcare insurance coverage under a contract of insurance and are considered a "Covered Person" under a self-funded employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA") (the ERISA plans at issue in this case are sometimes referred to herein collectively as "the Plans").

27.    Upon information and belief, the Plans delegated the responsibility of overseeing the processing and payment of claims for medical benefits submitted pursuant to the Plans to entities specializing in such services (sometimes referred to herein as "the Plan Administrator" or collectively as "the Plan Administrators").

28.    The Plan Administrators are required to administer the Plans in accordance with ERISA and with the Plans' terms and conditions.

29.     The Plans provide that plan benefits are subject to certain exclusions and

limitations, including the Plan Administrator's determination that, among other things, "care and

treatment is Medically Necessary" and that "charges are Usual and Reasonable," as those terms

are defined by the Plans.  As set forth in more detail below, the determination whether a

provider's charges are reasonable under an ERISA plan is made using what is known as the

"Usual, Customary, and Reasonable," or "UCR" amount, which is defined by applicable law.

30.     The Plan Administrators are obligated to pay claims in strict adherence with the

terms of the applicable Plan documents.  To do otherwise may constitute a breach of the Plan

Administrators' fiduciary duties.

31.     The Plan Administrator offered to pay only $8,164.00 toward the $82,893.89

invoice for the air transport services rendered to Patient One, claiming that Eagle's transport was

not medically necessary and that Eagle's charges were "unreasonable" and "egregious" because

they "represent almost 1100 percent of the Medicare reimbursement rate and almost 1600

percent of the cost of providing the service."

32.     The Plan Administrator paid only $7,600.00 toward the $32,389.00 invoice for

the air transport services rendered to Patient Two, claiming it "engaged the services of [Sentinel

and Frazier] to determine whether [Valley]'s charges . . . are reasonable," that it's "investigation

revealed that [the $32,389.00] amount does not represent the reasonable and customary amount

due for the services . . . provided," that Sentinel's and Frazier's "analysis revealed that [Valley's]

charges amount to over 560 percent of the Medicare reimbursement rate" and "over 500 percent

of the cost of providing the service," and that Sentinel and Frazier "recommend[ed] a reasonable

charge of $7,600 . . . [which] represents 131% of the Medicare reimbursement rate and provides

[Valley] with a 19% margin."

33.     The Plan Administrators have failed to pay a total of at least $816,716.38 towards

invoices for air transport services rendered by Eagle and Valley on behalf of patients covered by

the Plans based on similar determinations and recommendations made by Sentinel and Frazier.

34.     In making these claims and failing to pay Eagle and Valley in full, the Plan

Administrators have ignored the Plans' documents and failed to pay Eagle and Valley at a rate

consistent with those documents.

### The Plan Administrators' Refusal to Pay is Due To Sentinel's and Frazier's Misrepresentations Concerning Eagle's and Valley's Services and Costs, and False and Defamatory Statements Based Upon or Implied by such Misrepresentations

35.     Sentinel and Frazier are in the business of, inter alia, consulting with and

otherwise providing services to the Plan Administrators wherein Sentinel and Frazier review the

invoices of air ambulance service providers like Eagle and Valley, opine on whether the services

provided were medically necessary and whether the amounts charged are usual and reasonable,

and make recommendations to the Plan Administrators regarding whether and what amount to

pay for those services.

36.     The Plan Administrators' refusal to pay in full for Eagle's and Valley's services is

based upon Sentinel's and Frazier's multiple material misrepresentations of Eagle's and Valley's

operational costs and the medical necessity of Eagle's and Valley's services.  As explained

below, these and other statements published by Sentinel and Frazier have falsely stated or

implied that Eagle and Valley are dishonest, unethical, and fraudulent in their billing and other

business practices.

37.     As explained above, it is a patient's treating physician — not Eagle and Valley — who determines that transport of the patient via air ambulance is medically necessary.  Eagle and Valley provided patient care and transport only after each respective patient's treating physician had certified that such transport was medically necessary and summoned Eagle and Valley for that purpose.

38.     Despite the fact that Sentinel and Frazier know that the patient's treating physician – not Eagle and Valley – make the determination of medical necessity, Sentinel and Frazier have falsely represented that Eagle's and Valley's transport of multiple patients was not medically necessary and, based upon that false representation, recommended that Plan Administrators either don't pay for those services or pay less than the full amount.

39.     Moreover, upon information and belief, Frazier is not a licensed physician and is not otherwise qualified to opine on whether the care and treatment of a patient, including the air ambulance transport of a patient, is medically necessary.

40.     Sentinel's and Frazier's false and defamatory statements concerning Eagle's and Valley's charges for air ambulance services were based <u>not</u> on an analysis using the UCR amount, as required by law, but rather on an analysis of Eagle's and Valley's purported operational costs ("operational costs analysis").

41.     Sentinel's and Frazier's operational costs analysis is not a valid, reliable or acceptable method of determining whether Eagle's and Valley's charges are reasonable; is not consistent with the Plans' documents; and is not a standard that is used to make such determinations in the air medical transport industry.

42.     In addition, Sentinel and Frazier have falsely represented to the Plan administrators and others within the air ambulance industry that Sentinel and Frazier have actual knowledge of Eagle's and Valley's operational costs—a key component of their operational costs analysis.  In fact, Sentinel and Frazier have no such knowledge.

43.     For example, Sentinel and Frazier have falsely represented to Plan Administrators and others within the air ambulance industry that Eagle's and Valley's monthly operating costs are approximately ten times less than the actual amount of such costs.

44.     Based on those erroneous and unsupported figures, Sentinel and Frazier have recommended that Plan Administrators refuse to pay Eagle's and Valley's charges.

45.     In fact, Sentinel and Frazier have no actual knowledge of Eagle's and Valley's operational costs, and have grossly understated those costs, making their statements regarding Eagle's and Valley's operational costs, and their statements and recommendations regarding Eagle's and Valley's charges based on their operational costs analysis, false and misleading.

46.     Sentinel's and Frazier's statements regarding Eagle's and Valley's charges are also based on an inappropriate comparison of those charges to the Medicare fee schedule for similar services.

47.     A comparison of the rates charged by air medical transport services like Eagle and Valley with the Medicare rates is not a valid, reliable or acceptable method of determining whether Eagle's and Valley's charges are usual and reasonable or the UCR amount.  Moreover, such a comparison is not consistent with the Plans' documents and is not typically used to determine the reasonableness of a provider's charges in the air medical transport industry.

48.     Based upon the foregoing false statements and misrepresentations, Sentinel and Frazier have published the following false and defamatory statements about Eagle and Valley in their communications with Plan Administrators and others in the air ambulance industry:

(a)     Eagle's and Valley's charges are "egregious";

(b)     Eagle's and Valley's "charges are among the most egregious in the industry";

(c)      Air ambulance providers like Eagle and Valley "have become accustomed to threatening payors with the specter of balance-billing beneficiaries if their demands for full payment are not met" and Plan Administrators should "not acquiesce to this threat";

(d)     Eagle's and Valley's efforts to explain the medical necessity of their transports, and that the associated charges are usual and reasonable, is "a bunch of smoke";

(e) Eagle and Valley "will attempt to coerce you through a lot of bluster to pay the claim"; and

(f) Eagle and Valley "will also notify the beneficiary and let them know they are on the hook for the [balance], in the hopes they will be scared into coercing their employer into paying the claim."

49.     The foregoing statements published by Sentinel and Frazier have caused damage to Eagle's and Valley's reputations and improperly interfered with Eagle's and Valley's economic relations by falsely stating and/or implying that Eagle and Valley provide air medical transport services when such transports are not medically necessary, overbill patients and Plan

Administrators for such services, and are otherwise dishonest, unethical, and/or fraudulent in their billing and other business practices.

50.     Upon information and belief, Sentinel's and Frazier's operational costs analysis and other improper tactics (including improper comparisons of Eagle's and Valley's charges with the Medicare fee schedule), and resulting statements and recommendations, are part of a scheme to force air medical transport companies like Eagle and Valley to accept less than the usual and reasonable amount for their services.

51.     Upon information and belief, Sentinel and Frazier (and the Plan Administrators) benefit from this scheme in numerous ways.

52.     For example, upon information and belief, one of the principals and the "primary partner" of Sentinel is also the President and Chief Executive Officer of Allegiance Benefit Plan Management, a large Plan Administrator located in Montana, which benefits from paying providers as little as possible for their services.

53.     In addition, Sentinel and Frazier maintain a list of authorized air medical transport providers, which Sentinel and Frazier recommend the Plan Administrators use.  Upon information and belief, in connection with each referral, Sentinel and Frazier receive a referral fee from the provider.

54.     Sentinel's and Frazier's scheme not only deprives air medical transport companies like Eagle and Valley from being paid what they are rightfully and legally owed, it deprives patients of the benefits and other rights they are entitled to under their respective insurance policies or employee benefit plans.

55.     Indeed, a similar scheme was recently halted by the New York Attorney General. In that instance, the New York Attorney General reached a settlement with an insurer wherein the insurer paid approximately $200 million after it was found that they were operating "a defective and manipulated database that most major health insurance companies use to set reimbursement rates for out-of-network medical expenses."  The rates used in that database were based on the Medicare calculation for similar services.

56.     Similarly, a 2012 report released by the New York Department of Financial Services found that "[m]any insurers . . . are moving away from reimbursing out-of-network services based on the UCR cost of the services, and instead are using the Medicare fee schedule, which typically provides a lower reimbursement."  The report highlighted how this billing scheme "decreases how much insurers pay by as much as half or more in some cases," compared with UCR, hurting providers and consumers alike.  (See http://www.governor.ny.gov /sites/governor.ny.gov/files/archive/assets/documents/DFS%20Report.pdf).

**Contrary to Sentinel's and Frazier's Misrepresentations, Eagle and Valley Charged the Usual, Customary, and Reasonable Rate for their Services**

57.     The appropriate standard for determining whether the charges of an air medical transport service (like Eagle's and Valley's) are reasonable under ERISA plans (like those at issue here) is the "Usual, Customary, and Reasonable," or "UCR" amount.  The UCR amount is defined in a glossary of terms commonly used in health insurance coverage (and required by federal law to be made available to ERISA plan participants upon request), which is published by the Departments of Health and Human Services and Labor pursuant to the Affordable Care Act ("ACA").

58.     The ACA's definition of "Usual, Customary, and Reasonable" ("UCR"), which

appears in the glossary, is precise and comprehensive—the UCR amount is:

> The amount paid for a medical service in a geographic area based on what
> providers in the area usually charge for the same or similar medical service. The
> UCR amount sometimes is used to determine the allowed amount.

(See www.HeathCare.gov and www.dol.gov/ebsa/healthreform.)

59.     The website for CMS further elaborates on what constitutes the UCR amount.

(See http://www.cms.gov/CCIIO/Programs-and-Initiatives/Consumer-Support-and-

Information/Summary-of-Benefits-and-Coverage-and-Uniform-Glossary.html.)

60.     In addition, Congress has mandated that air ambulance rates are to be set by

market forces in order to further efficiency, innovation and low prices, as well as a wide variety

and high quality of air transportation services.

61.     Eagle and Valley are subject to subpart 49 U.S.C. § 4110 and operate under "Part

135" certificates from the Federal Aviation Administration ("FAA").  As such, Eagle and Valley

are "air carriers", as that term is defined in the Airline Deregulation Act ("ADA"). Pub. L. No.

95-504, 92 Stat. 1705 (1978).

62.     The ADA expressly states that it is in the public interest to place "maximum

reliance on competitive market forces and on actual and potential competition (A) to provide the

needed air transportation system, and (B) to encourage efficient and well-managed carriers to

earn adequate profits and to attract capital."  See Pub. L. No. 95-504, § 3(a).

63.     Indeed, to prevent state interference with its objective, Congress included a

preemption provision in the ADA that prohibits a State from enacting or enforcing any statute,

regulation or other provision of law "related to a price, route, or service of an air carrier."  See

Pub. L. No. 95-504, § 4(a) (currently codified at 49 U.S.C. § 41713(b)).

64.     The U.S. Department of Transportation ("DOT") has consistently taken the

position that the ADA's preemption provision applies to the field of air ambulance services.

65.     In April 2015, the DOT published a memorandum titled: Guidelines for the Use

and Availability of Helicopter Emergency Medical Transport ("Guidelines").  The Guidelines are

posted on the website for the DOT's Office of the General Counsel and summarize in one

comprehensive memorandum the various DOT opinions and court cases that have been issued

regarding the FAA and ADA preemption relating to air carriers operating air ambulance services.

The DOT also reaffirmed that rates are set by the market:

> Once the Secretary certifies an air ambulance operator, the competitive
> marketplace, rather than state regulations, controls the operator's prices, routes,
> and services, and only the Secretary may revoke an air ambulance operator's
> certificate.

66.     A consultant retained by Eagle and Valley, who has 25 years of experience in the

air medical transport industry, has owned an air ambulance company, has been an executive

officer of several air ambulance companies, has opined that the amounts Eagle and Valley

charged for their services are consistent with the amounts other providers in the area usually

charge for the same or similar medical services, i.e., are the UCR amount.

67.     Other sources also support a conclusion Eagle and Valley charge the UCR

amount, including at least one survey conducted by the United States government regarding the

prevailing rates in the Western region of the United States and annual rates of air ambulance

companies published by the State of Arizona.

68.     Operating an air ambulance company is costly.  Unlike other health care providers, air ambulance companies like Eagle and Valley do not have clients, generally do not have repeat business and do not have a schedule full of appointments.

69.     Eagle and Valley have 24-hour ready crews, including pilots, flight nurses and paramedics, on constant standby in hangars near airports in rural locations throughout the United States.

70.     Eagle and Valley operate fixed and rotor wing aircraft, which cost in the millions of dollars.  Moreover, each aircraft is retrofitted and equipped with emergency equipment and supplies at significant cost.

71.     The cost of readiness is formidable and Eagle's and Valley's investments are significant.

72.     Moreover, the overhead costs are almost entirely fixed and seldom change regardless of how many patients are transported.

73.     Eagle and Valley consider numerous factors in setting the rates in a particular region, including but not limited to, aircraft type, market investment, infrastructure, operating costs, number of flights in that market, wages in that market, and fuel prices.

74.     Eagle and Valley are associated with one of the largest providers of air ambulance services in the United States.  As a result, Eagle and Valley have a vast understanding of industry standards and rates and have determined that Eagle's and Valley's rates are in line with those charged by other similarly situated air ambulance providers.

75.     Unlike other segments of the air-ambulance market, such as hospital-based providers or government operators, independent operators like Eagle and Valley receive no

16

subsidies and instead bear the entire brunt of the operating costs associated with running an air ambulance service.  As a result of the differences between these business models, a comparison of Eagle's and Valley's rates with those of hospital-based or government operators is inapposite. (See United States General Accounting Office report, AIR AMBULENCE:  Effects of Industry Changes on Services Are Unclear GAO-10-907, Published and publicly released Sept. 30, 2010.)

## First Claim for Relief
### (Defamation)

77.     Eagle and Valley incorporate by reference all of the foregoing paragraphs.

77.     As set forth more fully above, Sentinel and Frazier have issued letters, emails, and other communications to several Plan Administrators and others within the air ambulance industry which contain numerous false and defamatory statements and implications.  For example, Sentinel and Frazier have made false and misleading representations regarding Eagle's and Valley's operational costs to support false and defamatory statements and implications that Eagle and Valley overbill for their services, that Eagle's and Valley's charges are "egregious," that Eagle and Valley threaten and "attempt to coerce" Plan Administrators and patients to get paid, and are otherwise dishonest, unethical, and fraudulent in their business practices.

78.     Sentinel's and Frazier's statements and implications are defamatory because they allege and imply that Eagle's and Valley's services were not necessary, that Eagle and Valley overbilled for those services, and that Eagle and Valley are dishonest, unethical, and fraudulent—conduct which is incongruous with the exercise of a lawful business and impeaches Eagle's and Valley's honesty, integrity, virtue, or reputation and thereby exposes Eagle and Valley to public hatred, contempt or ridicule.

79.     Upon information and belief, Sentinel and Frazier intended to communicate the defamatory meaning of their statements and implications.

80.     Upon information and belief, Sentinel and Frazier knew the defamatory meaning of their statements and implications was false or acted in reckless disregard of the statements' and implications' falsity.

81.     The statements and implications are not subject to any privilege.

82.     As a result of Sentinel's and Frazier's defamatory statements and implications, Eagle and Valley have been damaged in an amount to be determined at trial, but no less than $689,418.09. Eagle and Valley have also suffered and continue to suffer substantial and irreparable harm, including damage to their reputations and loss of goodwill and competitive position in the air ambulance industry as a result of Sentinel's and Frazier's defamatory statements and implications.

**Second Claim for Relief**
**(False Light)**

83.     Eagle and Valley incorporate by reference all of the foregoing paragraphs.

84.     As set forth more fully above, Sentinel and Frazier have issued letters, emails, and other communications to several Plan Administrators and others within the air ambulance industry which contain numerous false and defamatory statements and implications. For example, Sentinel and Frazier have made false and misleading representations regarding Eagle's and Valley's operational costs to support false and defamatory statements and implications that Eagle and Valley overbill for their services, that Eagle's and Valley's charges are "egregious," that Eagle and Valley threaten and "attempt to coerce" Plan Administrators and patients to get paid, and are otherwise dishonest, unethical, and fraudulent in their business practices.

85.     Upon information and belief, Sentinel and Frazier have issued similar letters, emails, or other communications, and/or made similar statements, to other Plan Administrators, patients, hospitals, doctors and other health care providers, and others within the air ambulance industry.

86.     In doing so, Sentinel and Frazier have given publicity to the fees Eagle and Valley charge for their services, and Eagle's and Valley's efforts to collect those fees, that places Eagle and Valley before the public in a false light, including that Eagle's and Valley's services were not necessary, that Eagle and Valley overbilled for those services, and that Eagle and Valley are dishonest, unethical, and fraudulent in their business practices.

87.     The false light Eagle and Valley have been placed in would be highly offensive to a reasonable person.

88.     Upon information and belief, Sentinel and Frazier not only intended that their statements and implications place Eagle and Valley before the public in a false light, Sentinel and Frazier also had knowledge of or acted with reckless disregard as to the falsity of the publicized matters and the false light in which Eagle and Valley would be placed.

89.     As a result of Sentinel's and Frazier's actions, Eagle and Valley have been damaged in an amount to be determined at trial, but no less than $689,418.09.  Eagle and Valley have also suffered and continue to suffer substantial and irreparable harm, including damage to their reputations and loss of goodwill and competitive position in the air ambulance industry as a result of Sentinel's and Frazier's publicizing of matters that place Eagle and Valley before the public in a false light.

### Third Claim for Relief
**(Tortious Interference)**

90.     Eagle and Valley incorporate by reference all of the foregoing paragraphs.

91.     Sentinel and Frazier had actual knowledge of Eagle's and Valley's existing contractual relations with the Plan Administrators and the patients for whom Eagle and Valley provided medical transport services, including Patients One and Two.  Sentinel and Frazier also had actual knowledge that Eagle and Valley had prospective economic relations with future patients and Plan Administrators.

92.     Sentinel and Frazier intentionally interfered with Eagle's and Valley's existing and prospective economic relations by, among other things, stating and implying that Eagle's and Valley's services were not medically necessary and that Eagle's and Valley's charges for those services were unreasonable and egregious based on Sentinel's and Frazier's faulty operational costs analysis (and other improper methods), and recommending that the Plan Administrators reimburse Eagle and Valley a mere fraction of the amount owed in connection with Eagle's and Valley's air transport services.

93.     Sentinel and Frazier also intentionally interfered with Eagle's and Valley's existing and prospective economic relations by indicating that Eagle and Valley threaten and attempt to coerce both Plan Administrators and patients in order to collect outstanding balances.

94.     Sentinel's and Frazier's interference was undertaken with improper means, including through the use of defamatory statements and implications and by placing Eagle and Valley before the public in a false light, as alleged herein.

95.     Sentinel's and Frazier's interference was also undertaken with improper means through the violation of established standards and practices in the air medical transport industry.

For example, Sentinel's and Frazier's operational costs analysis is not a valid, reliable or acceptable method of determining whether Eagle's and Valley's charges are reasonable, and use of Sentinel's and Frazier's operational costs analysis in making these determinations, rather than the UCR amount, violates an established standard of the air medical transport industry.

96.     As a result of Sentinel's and Frazier's intentional interference with Eagle's and Valley's contractual and prospective economic relations, Eagle and Valley have been damaged in an amount to be determined at trial, but no less than $689,418.09.  Eagle and Valley have also suffered and continue to suffer substantial and irreparable harm, including damage to their reputations and loss of goodwill and competitive position in the air ambulance industry as a result of Sentinel's and Frazier's interference.

**Fourth Claim for Relief**
**(Permanent Injunction)**

97.     Eagle and Valley incorporate by reference all of the foregoing paragraphs.

98.     Eagle and Valley are likely to succeed on the merits of their claims.

99.     Eagle and Valley will likely suffer irreparable harm unless the injunction is granted, including but not limited to loss of their reputations and business goodwill with current and potential patients and Plan Administrators, and loss of their competitive positions in the air ambulance market.

100.     Legal remedies will not adequately compensate Eagle and Valley for that harm given the time, money and effort Eagle and Valley have expended to build their reputations and goodwill and achieve their competitive positions in the air ambulance industry.

101.     The balance of hardships between Eagle and Valley and Sentinel and Frazier favors Eagle and Valley because the injury suffered by Eagle and Valley as a result of Sentinel's

and Frazier's defamatory statements and implications, publicizing of matters that place Eagle

and Valley before the public in a false light, and application of an inappropriate standard in

determining that Eagle's and Valley's charges for their services are unreasonable, far exceeds

whatever injury Sentinel and Frazier might sustain as a result of being prohibited from doing so.

102.    Issuance of the injunction will not adversely affect the public interest because

prohibiting Sentinel and Frazier from making defamatory statements and implications,

publicizing matters that place Eagle and Valley before the public in a false light, and making

determinations regarding the reasonableness of Eagle's and Valley's air ambulance charges

using an inappropriate standard, will enhance competition in the air ambulance industry in

harmony with Congressional intent.

### Prayer for Relief

WHEREFORE, Eagle and Valley request a judgment in its favor and against Sentinel

and Frazier, including the following:

A.      A permanent injunction;

B.      Compensatory damages;

C.      Attorney fees and costs, as provided by applicable law; and

D.      Such further and additional relief as the Court may deem just and equitable.

DATED this 9th day of March, 2016.

PARR BROWN GEE & LOVELESS, P.C.

By:    <u>/s/ Jeffrey J. Hunt</u>
          Jeffrey J. Hunt
          Royce B. Covington
          Rachel Lassig Wertheimer
          *Attorneys for Plaintiffs*