IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| EAGLE AIR MED CORPORATION, a Utah corporation; and VALLEY MED FLIGHT INC., a North Dakota corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>SENTINEL AIR MEDICAL ALLIANCE, LLC, a Wyoming limited liability company; and JEFFREY FRAZIER,<br><br>Defendants. | MEMORANDUM DECISION<br>AND<br>ORDER<br><br>Case No. 2:16-cv-00176-TC-EJF |

Plaintiffs Eagle Air Med Corporation (Eagle) and Valley Med Flight Inc. (Valley) operate air ambulances—typically fixed-wing aircraft—that transport patients from small, rural hospitals to larger, better-equipped hospitals. Defendants Sentinel Air Medical Alliance (Sentinel) and Jeffrey Frazier, Sentinel's principal and part owner, provide information for health insurance companies and benefit plan administrators to use to determine how much to reimburse air ambulance companies for their services. According to Eagle and Valley, Sentinel and Mr. Frazier made false and defamatory statements concerning the rates they charged to transport

patients, the medical necessity of the flights, and their billing practices. They bring state law claims of defamation, false light, and tortious interference with economic relations. Sentinel and Mr. Frazier have moved for summary judgment on all of Eagle and Valley's claims. For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

Mr. Frazier and Sentinel (the court will refer to the Defendants together as "Sentinel") provide consulting services to health insurance companies and third-party benefit plan administrators. Specifically, Sentinel reviews claims for air ambulance transports and advises on the medical necessity of the flights and the reasonableness of the billed charges ("medical necessity" and "reasonable" are common defined terms in benefit plans).

This case largely concerns twenty-one claim review letters that Sentinel sent to insurance claim adjusters and benefit plan administrators as part of its consulting work. The letters all follow the same general form:

> Thank you for the opportunity to review and evaluate a claim for air ambulance transport service provided by Valley Med Flight. The patient is a beneficiary of Consumer's Mutual of Michigan.
>
> On September 13, 2015, Valley transported the patient from Calumet, Michigan, to Gwinn, Michigan, by fixed-wing air ambulance. Transport distance was 81 air miles. Billed charges for this transport amount to **$29,659**. . . .
> . . .
> Reimbursement provided under **Medicare** for this transport would be **$5,368**[.]
> . . .
> <u>Transport time:</u> The <u>total elapsed time</u> for this patient transport, from initial notification to when the patient arrived at the receiving facility, was 2 hours.
>
> This patient was transported by fixed wing air ambulance over a very short distance, 81air [sic] miles. For fixed wing transports, the

patient must be transported by ground ambulance from the sending facility to the airport, then flown to an airport in the city where the receiving facility is located, then transported by ground ambulance to the receiving facility.  For transports less than 250 miles, it is generally faster to send the patient by ground ambulance than by fixed wing air ambulance.  If time were truly critical, the patient should have been transported by helicopter.

Medical necessity: Our physician reviewed the patient records associated with this transport and determined that transport by air ambulance was not medically necessary.

Provider's costs: The aircraft used for this transport was a Pilatus PC-12 single engine turbo-prop airplane. Charter costs for this aircraft run from $1200 to $1,800 per flight hour. It must be assumed the charter operator makes a profit at this rate.

Total flight time for Valley's aircraft during this transport was approximately 40 minutes.

If Valley's charges are placed on an hourly basis, they amount to $42,370 per flight hour ($29,659/.7).

By way of comparison, charter costs for a Boeing 747 are approximately $25,000 per flight hour.

Valley's costs for the medical crew that participated in this transport are less than $75 per hour each, inclusive of benefits. Total medical crew time for this transport was less than 3 hours.

Aircraft charter costs and medical crew cost data are presented for comparison purposes. Sentinel Air Medical Alliance maintains a comprehensive database of air ambulance provider costs. For a given geographic area and aircraft type, we can determine with great accuracy the provider's cost to perform the service.  In this case, an accurate estimate of Valley's costs can be derived by dividing their monthly operating costs of approximately $192,000 by an assumed 30 transports per month, or **$6,400**. We are confident that a cost-plus reimbursement can be based on this figure.

Charges by other providers: Sentinel has a contracted provider that would have performed this transport for $8,700.

> Recommendation: Health plan administrators have a responsibility to ensure plan funds are expended for reasonable plan expenses. It is assumed that the word "reasonable" relates to the pricing of services, as well as medical necessity. Many plan documents contain language relating to "customary" charges. In this case, Sentinel's provider can be used as a comparable for purposes of determining whether the charges are customary. In other words, this is the customary rate.
>
> Whether Valley's billed charges for this transport are viewed from the perspective of Medicare-plus, cost-plus, or in comparison to charges from other providers, they are not reasonable. In fact, they are egregious. These charges represent **552 percent** of the Medicare reimbursement rate, **340 percent** of charges from a competing provider, and **463 percent** of the cost of providing the service.
>
> A reasonable reimbursement for this transport would be **$11,900**. This represents 221 percent of the Medicare reimbursement rate and provides Valley with an 86 percent margin.
>
> For perspective, the average margin in the (for-profit) commercial aviation (charter) industry is approximately 10 percent, though many operators experience much lower margins.
>
> Alternatively, since transport by air ambulance was determined to be not medically necessary, the plan may wish to reimburse the provider at the amount that would have been charged by a ground ambulance service, approximately $4,400.

(Ex. B-1-21 to Defs.' Mot. Summ. J. (ECF No. 206-4) (emphases in original).)

In addition to providing these review letters, Sentinel emailed plan administrators with advice for the claim handling process. Three emails, all sent by Mr. Frazier, are at issue here. The first, sent on April 12, 2014, to Ross Hinman, a benefit consultant, and Jeff Shepherd, a claim administrator, reads:

> Ross and Jeff,
>
> I have attached a review of your claim along with an invoice for our services. As you can see, you can deny the claim as not medically

necessary. Additionally, the patient was not transported to the nearest appropriate facility.

If you chose to pay the provider, we recommend that you offer $8,164 in settlement of this claim. It is important to remain firm when negotiating with air ambulance providers. Eagle Air Med's charges are among the most egregious in the industry. Air ambulance providers have become accustomed to threatening payors with the specter of balance-billing beneficiaries if their demands for full payment are not met. Please do not acquiesce to this threat!

You can inform the provider that the beneficiary's plan has limits on reimbursement for ambulance services and you are willing to send them a check directly for $8,164. You can also inform the provider that, under ERISA, a plan sponsor can only reimburse for <u>reasonable</u> plan expenditures. If they tell you they will balance-bill your beneficiary, tell them the same amount will be sent, not to the provider, but to the beneficiary. I have provided you with an expert opinion on Eagle Air Med's cost of service, along with a recommended <u>reasonable</u> reimbursement rate. Further, if this case should go to trial, we have a copy of a report prepared on behalf of the air ambulance industry which details the provider's cost of performing air transport services.

Our service does not end here. . . . Please let me know the final disposition of this claim.

Best regards,
Jeff Frazier

(Ex. 1 to Pls.' Opp. to Mot. Summ. J. (ECF No. 227-1) (emphases in original).) The second, a

follow-up sent by Mr. Frazier to Mr. Shepherd on May 13, 2014, reads:

Jeff,

It's my understanding there has not yet been an attempt to negotiate this claim. If that's the case, send an adverse determination of benefits and reference the report created by Sentinel. Ensure you let them know the plan docs don't allow for reimbursement of non-

medically necessary services, nor do they allow for unreasonable plan expenditures. Tell them you would like to make some payment as the patient did require transport (just not to the hospital was transferred to, and not by air). Offer them the $8K number. Then, wait. At some point, they will respond to you and inform you that they will balance-bill your beneficiary. They will also notify the beneficiary and let them know they are on the hook for $80K, in the hopes they will be scared into coercing their employer into paying the claim. At that point, you can either send the revocation letter already signed by the beneficiary, or (better yet) have the beneficiary sign the attached form "Patient_letter_1" and submit it to the provider. Concurrently, you will send the attached letter "AOB-Threaten-Revocation" to the provider (have both of these docs looked at by your counsel). Then wait. Expect this thing to play out over a period of 3 to 4 months. At some point in the future, you will again offer the $8K and they will accept is [sic] as payment in full. Let's stay in touch on this. Above all, be patient!!

Best Regards,
Jeff

(Ex. 2 to Pls.' Opp. to Mot. Summ. J. (ECF No. 227-2).)

Mr. Frazier also sent an October 3, 2014, email to Michelle Greenfield, a claim administrator with Tall Tree Administrators about a claim from Eagle:

Michelle,

This is all a bunch of smoke! The writer refers to level one trauma services. The patient was not injured as the result of a trauma. [The patient] required pulmonary services in response to pneumonia. These services are available at both facilities referenced in your denial letter. Advance Life Support level ground ambulance services are available through San Juan County EMS. They do perform long distance ground transports. I would stand firm with he [sic] provider and let them know that the plan documents only allow for reimbursement of medically-necessary services. You may want to offer them the ground rate. [P]ay them directly only if they agree to accept your payment as full consideration for services provided. You can also offer to pay them at the rate that would have been charged by San Juan Regional AirCare.

We have had several payors receive appeals from this provider. They will attempt to coerce you through a lot of bluster to pay the claim. As long as you are faithfully administering the plan documents you have no worries.

Best Regards,
Jeff Frazier

(Ex. 3 to Pls.' Opp. to Mot. Summ. J. (ECF No. 227-3).)

Eagle and Valley base their claims on a number of statements contained in these letters and emails that they claim to be false and defamatory. The statements can be grouped into three general categories:

- **Statements evaluating Eagle and Valley's billed charges.** These include Sentinel's per-flight cost and margin calculations, as well as Sentinel's conclusions that the charges were "egregious" and "among the most egregious in the industry."

- **Statements concerning medical necessity.** These include statements in claim review letters that Sentinel's physicians had reviewed patient records and determined that transport by air ambulance was not medically necessary; the statement in the email to Ms. Greenfield that Eagle's claim of medical necessity was "a bunch of smoke," and used "to coerce you through a lot of bluster to pay the claim;" and a statement in a single review letter about "the issue of self-referral sometimes present in the air ambulance industry."

- **Statements concerning balance billing.** These include the statement that air ambulance providers "have become accustomed to threatening payors with the specter of balance-billing beneficiaries if their demands for payment are not met," and to "not acquiesce to this threat," as well as the statements that Eagle and Valley "will notify the beneficiary

and let them know they are on the hook for the [balance], in the hopes they will be scared

into coercing their employer into paying the claim."[1]

(Pls.' Opp. to Mot. Summ. J. at 41–42, 49 (ECF No. 226) (internal record citations omitted).)

Sentinel moves for summary judgment on five often-overlapping grounds: <u>first</u>, that the

statements are either opinions or are substantially true, and so incapable of supporting

defamation and false light claims; <u>second</u>, that the common interest privilege applies to the

communications, and that Eagle and Valley have no evidence showing Sentinel abused the

privilege; <u>third</u>, that Sentinel never published any of the statements to the public as necessary to

support a false light claim; <u>fourth</u>, that Eagle and Valley have no proof of causation and harm

necessary to support their claims; and <u>fifth</u>, that the Employee Retirement Income Security Act

(ERISA) preempts Eagle's claims, all of which involve ERISA-governed benefit plans.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "A fact is 'material' if, under the governing law, it could have an effect on the

---

[1] The court considers this list of allegedly defamatory statements to be complete.  Eagle and Valley seem to leave open the possibility that they will base their defamation claim on other statements, "including the existence and composition of [Sentinel's] so-called 'comprehensive database,' and the validity and appropriateness of their cost-plus analysis to determining the reasonableness of [air medical transport] charges."  (Pls.' Opp. to Mot. Summ. J. at 47.)  But a plaintiff must identify the precise statement or statements it believes to be defamatory.  <u>See</u> <u>Davidson v. Baird</u>, 438 P.3d 928, 936–37 & n.4 (Utah Ct. App. 2019).  This allows a defendant to mount an adequate defense, allows a court to determine whether the statements are actionable as a matter of law, and frames the claim for the jury.  <u>See</u> <u>SIRQ, Inc. v. The Layton Companies, Inc.</u>, 379 P.3d 1237, 1245 (Utah 2016).  While the court will consider the context in which these listed statements were made, the court will not consider whether additional statements independently support a defamation claim.

outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." Tabor v. Hilti, Inc., 703 F.3d 1206, 1215 (10th Cir. 2013) (internal quotation omitted)).

"If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant." Talley v. Time, Inc., 923 F.3d 878, 893–94 (10th Cir. 2019) (internal quotation omitted). Should the nonmovant bear the burden of persuasion at trial, "[t]hese facts must establish, at a minimum, an inference of the presence of each element essential to the case." Id. (quoting Savant Homes, Inc. v. Collins, 809 F.3d 1133, 1137 (10th Cir. 2016)).

When evaluating a motion for summary judgment, the court must view the facts and draw all reasonable inferences in favor of the non-moving party. Tabor, 703 F.3d at 1215. But this is only true insofar as "there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. (quoting Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586–587 (1986)).

## DISCUSSION

### Defamation

The court begins with Eagle and Valley's defamation claim. "At its core," the tort of defamation "is intended to protect an individual's interest in maintaining a good reputation." West v. Thomson Newspapers, 872 P.2d 999, 1008 (Utah 1994). "To establish defamation under Utah law, a plaintiff must prove four elements: (1) that the defendants 'published the statements'; (2) that the 'statements were false, defamatory, and not subject to any privilege'; (3)

'that the statements were published with the requisite degree of fault'; and (4) that 'their publication resulted in damage' to the plaintiff." Hogan v. Winder, 762 F.3d 1096, 1105 (10th Cir. 2014) (quoting West, 872 P.2d at 1007–08).

## I.      Substantial Truth, Opinion, and Defamatory Meaning

Given the range of statements at issue, Sentinel seeks summary judgment on a number of different grounds. It labels some as non-actionable opinion, some as substantially true, and argues that others, read in context, do not carry a defamatory meaning. The court will address each statement in turn.

### A.   Statements that Eagle and Valley's Charges are "Egregious"

Sentinel argues that its statements labelling Eagle and Valley's billed charges as "egregious" are non-actionable opinions. The court agrees.

Under Utah law, "[b]ecause expressions of pure opinion fuel the marketplace of ideas and because such expressions are incapable of being verified, they cannot serve as the basis for defamation liability." West, 872 P.2d at 1015; see also B.J. Barnes & Sons Trucking, Inc. v. Dairy Farmers of Am., Inc., No. 2:05-CV-351-BSJ, 2006 WL 1472689, at *3 (D. Utah May 22, 2006) ("To be demonstrably 'true' or 'false,' the published statements must be statements of fact, not mere opinion or belief."). Of course, "opinions rarely stand alone, isolated from any factual moorings." West, 872 P.2d at 1015.

> To convince readers of the legitimacy of an opinion, authors typically describe the perceived factual bases for opinions, seeking to demonstrate that the author's opinions are grounded in common sense. Assertions of fact, being objectively verifiable and much more capable of harming reputation, are not entitled to the same degree of protection afforded expressions of opinion.

Id.  The Utah Supreme Court gives four factors to differentiate nonactionable opinions from

statements of fact:

> (i) the common usage or meaning of the words used; (ii) whether the
> statement is capable of being objectively verified as true or false;
> (iii) the full context of the statement—for example, the entire article
> or column—in which the defamatory statement is made; and (iv) the
> broader setting in which the statement appears.

Id. at 1018.

Sentinel's claim review letters do contain assertions of fact concerning Eagle and

Valley's billed charges, which the court will discuss below.  But its statements in those letters

(and in one of Mr. Frazier's emails) that Eagle and Valley's charges were "egregious" or "among

the most egregious in the industry" are statements of opinion and cannot sustain a defamation

claim.  First, the word "egregious" is an adjective used to describe something as "especially" or

"conspicuously" bad.  Merriam-Webster Online Dictionary, https://www.merriam-

webster.com/dictionary/egregious (last visited Aug. 29, 2019).  As such, it is an inherently

subjective term and not readily verifiable.  Cf. Spencer v. Glover, 397 P.3d 780, 785 (Utah Ct.

App. 2017) (concluding that the superlative "worst ever" expressed subjective belief and

amounted to rhetorical hyperbole, and thus constituted nonactionable opinion).

Additionally, the context in which Sentinel used the term "egregious" makes clear that

the Sentinel was expressing an opinion.  The term must be read in light of Sentinel's overall

evaluation of the reasonableness of certain air ambulance charges:

> [I]t is assumed that the word "reasonable" relates to the pricing of
> services . . . .  Whether Valley's billed charges for this transport are
> viewed from the perspective of Medicare-plus, cost-plus, or in
> comparison to charges from other providers, they are not reasonable.
> In fact, they are egregious.

(Ex. B-1-21 to Defs.' Mot. Summ. J.)

While the underlying cost comparisons may be capable of verification, Sentinel used the term "egregious" as "a vigorous epithet" used to convey its belief that the costs were "extremely unreasonable." Greenbelt Co-op. Pub. Ass'n v. Bresler, 398 U.S. 6, 14 (1970). Used this way, the term constitutes nonactionable opinion and cannot sustain a defamation claim.

### B.  Sentinel's Per-Flight Cost Calculations

This case largely centers on Sentinel's cost-per-flight calculations, which Sentinel reached by dividing an approximation of Eagle and Valley's monthly operating costs by an assumed number of flights per month. Sentinel claimed to rely on "a comprehensive database of air ambulance provider costs" that allowed it to "determine with great accuracy the provider's cost to perform the service." (Ex. B-1-21 to Defs.' Mot. Summ. J.)

For the benefit claims at issue here, Eagle and Valley billed between $29,659 and $83,360 per flight. Sentinel's cost-per-flight estimates ranged from $5,167 to $9,200. Having reviewed the evidence, the court concludes that there is no genuine dispute concerning the material accuracy of the calculations.

Under Utah law, truth is an absolute defense to a defamation claim. Brehany v. Nordstrom, Inc., 812 P.2d 49, 57 (Utah 1991). And to be true, a statement need not be completely accurate. "Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 517 (1991) (internal quotation omitted); see also Jensen v. Sawyers, 130 P.3d 325, 342 (Utah 2005) ("That statements which may be infected with inaccuracy, innuendo, and outright falsity and still not be actionable so long as their 'gist' or 'sting' rings true is but one of countless

ways the law defers to the commanding presence of free expression among our liberties."). "Put another way, the statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" Masson, 501 U.S. at 517 (quoting R. Sack, Libel, Slander, and Related Problems 138 (1980)).

"[D]etermining whether a publication is materially false requires examination of the published statements in context, not in isolation." Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1108 (10th Cir. 2017). Still, the "proscription against reading statements in isolation does not forbid the court from examining the particular statements identified as objectionable for their truth or falsity . . . as long as the court reads them in context." Rinsley v. Brandt, 700 F.2d 1304, 1310 (10th Cir. 1983).

Determining the precise cost of each flight in this case may be impossible. Chris Webb, an executive with Eagle and Valley, testified that the companies did not regularly track their own costs. (See Dep. of Chris Webb 56:2–4, Ex. L to Defs.' Mot. Summ. J. (ECF No. 206-19) ("If we don't know and didn't track and don't have that cost to perform that service, all-in, [Sentinel] doesn't.").) Nonetheless, the parties have proffered testimony, financial documents, and expert reports to support various cost-per-flight estimates. This evidence uniformly shows that Sentinel's estimates were materially accurate.

The court need only consider the evidence most favorable to Eagle and Valley—the report prepared by their expert, Derk Rasmussen, which lists an average cost per flight of $9,447.

Assuming the accuracy of Mr. Rasmussen's report[2], Sentinel understated the per-flight costs by, on average, approximately thirty percent.

Read in context, this thirty percent understatement does not materially undermine the accuracy of Sentinel's cost calculations.  Sentinel presented its calculations as a comparison to Eagle and Valley's billed charges, which ranged from $29,659 to $83,360, and expressed the difference as a percentage—for instance, that the billed charge represented "463 percent of the cost of providing the service."  (Ex. B-1-21 to Defs.' Mot. Summ. J.)  To take the review letter excerpted here as an example, a thirty percent increase to Sentinel's calculation of $6,400 amounts to $8,320.  Valley's billed charge of $29,659 still represents 356 percent of the approximate cost of the flight.  A thirty percent increase in the cost of each flight does not, for the purpose of a defamation claim, change the "gist" of Sentinel's statements that the billed charges far exceeded the costs of performing each flight.

### C.  Sentinel's Profit Margin Calculations

Sentinel's profit margin calculations are a different matter.  After calculating per-flight operating costs, Sentinel recommended what it considered to be a reasonable "cost-plus" reimbursement amount from which Eagle and Valley would receive a certain profit margin— typically around a 50% margin, but ranging from 19% to 203%.  To take the above letter as an example, Sentinel states that "[a] reasonable reimbursement for this transport would be $11,900," which "provides Valley with an 86 percent margin."  (Id.)

---

[2] Mr. Rasmussen's report is the subject of a pending Daubert motion.  (See Defs.' Mot. to Exclude Opinions of Pls.' Expert Derk Rasmussen (ECF No. 295).)  At the hearing on the present motion, counsel for Sentinel invited the court to accept Mr. Rasmussen's calculations as accurate to resolve whether Sentinel is entitled to summary judgment on grounds of truth.  The court will do so, without deciding the Daubert motion.

"Whether a statement is capable of sustaining a defamatory meaning is a question of law" to be resolved by the court. <u>West</u>, 872 P.2d at 1008. A statement is defamatory "if it impeaches an individual's honesty, integrity, virtue, or reputation and thereby exposes the individual to public hatred, contempt, or ridicule." <u>Id.</u> Statements can be directly defamatory—that is, false and damaging on their face. "But even if a statement is not directly defamatory because it is true, it can be defamatory by implication." <u>Hogan</u>, 762 F.3d at 1105.

> The classic example is the statement that John Smith was seen walking into a hotel room with Mary. On its face, the statement does not communicate anything intending to injure reputation. If, however, there is added to the statement the fact that John Smith is married to someone other than Mary, the inference that the ordinary reasonable recipient may draw—that John is involved in an adulterous relationship with Mary—becomes defamatory.

<u>West</u>, 872 P.2d at 1011 n.18 (internal quotation omitted).

By asserting the profit margin that Eagle and Valley would make on each flight (as opposed to simply the operational cost of each flight), the statements can be read to imply that Eagle and Valley arbitrarily overbilled for transports to collect exorbitant profit margins, which would impeach the companies' honesty and integrity. The statements are thus capable of carrying a defamatory meaning.

Moreover, Eagle and Valley have presented evidence from which a jury could find that the profit margin calculations were materially inaccurate. They point to the "payor mix" —the overall stream of revenue that includes Medicare and Medicaid reimbursements, individual customers who self-pay (and often do not pay) for flights, and reimbursements from commercial insurance providers such as those here. According to John Schneider, Eagle and Valley's expert in healthcare economics:

> The operational economics of [air medical transport] operations, especially their high fixed and sunk costs coupled with high levels of bad debt and heavily discounted charges, require that providers offset low-paying (or non-paying) users with higher paying users in order to maintain fiscal solvency. It is impossible for [air medical transport] providers to accept, as payment in full, heavily discounted charges from all payors and expect to remain solvent.

(Rep. of John E. Schneider at 19, Ex. 4-1 to Pls.' Opp. to Mot. Summ. J. (ECF No. 227-5).) This evidence suggests legitimate reasons for the billed charges—that they were driven by the economic realities of the air ambulance industry, not by unscrupulous efforts to obtain high profits. Because Sentinel's profit margin calculations can be read to imply that Eagle and Valley were arbitrarily overbilling patients, and because Eagle and Valley have submitted evidence that the implication is false, the statements can support a claim of defamation.

### D. Sentinel's Medical Necessity Determinations

Eagle and Valley allege that three different statements concerning medical necessity are defamatory. First, in its claim review letters, Sentinel would echo the opinions of medical reviewers who opined that transports were not medically necessary. Second, in his email to Ms. Greenfield, Mr. Frazier disparaged Eagle's claim of medical necessity as "a bunch of smoke" used "to coerce you through a lot of bluster to pay the claim." (Ex. 3 to Pls.' Opp. to Mot. Summ. J.) Lastly, in one claim review letter, Sentinel warned of self-referral between air ambulance companies and hospitals.

Sentinel's first statements—its matter-of-fact conclusions that flights were not medically necessary (as well as the underlying physician reviews)—imply no wrongdoing on the part of Eagle or Valley, and so carry no defamatory meaning.

"[I]n determining whether a particular statement fits within the rather broad definition of what may be considered defamatory, the guiding principle is the statement's tendency to injure a reputation in the eyes of its audience." <u>West</u>, 872 P.2d at 1008. As both sides acknowledge, a patient's treating physician determines whether air transport is medically necessary. Sentinel's audience—the administrators and claim adjusters reviewing benefit claims—would have been well aware of this decision-making framework. Sentinel's contrary opinions might impugn the reputations of the medical personnel who made the necessity determination, but not Eagle and Valley.

The second statement, Mr. Frazier's email to Ms. Greenfield in which he labels a medical necessity determination "a bunch of smoke," only describes Mr. Frazier's disagreement with a medical necessity determination. Any reasonable reader would understand Mr. Frazier's use of the phrase as non-actionable "rhetorical hyperbole." <u>Spencer</u>, 397 P.3d at 785 (internal quotation omitted).

However, the third statement, Sentinel's reference to self-referral, does support a claim of defamation. In one of its claim review letters, Sentinel includes the following passage:

> The sending facility is located in Blanding, Utah. Blanding is also the location of the home office of Eagle Air Med. The relationship between the facility and the provider is unknown, but payors must be aware of the issue of self-referral sometimes present in the air ambulance industry.

(Ex. B-1-1 to Pls.' Mot. Summ. J. (ECF No. 206-4).)

The statement does not directly accuse Eagle of engaging in self-referral, and each part of the statement, read in isolation, may be true. But "it is the implication arising from the statement and the context in which it was made, not the statement itself, which forms the basis of [the]

claim." West, 872 P.2d at 1011. Though Sentinel disavowed any knowledge of self-referral, its statement can be read to imply that Eagle was engaging in the practice, and thus acting dishonestly and unethically.

     E.  Sentinel's Statements Concerning Balance Billing

Balance billing occurs when a benefit plan declines to reimburse a healthcare provider for the full billed charge, and a healthcare provider then bills the patient for the remaining balance. In emails to claim adjusters, Mr. Frazier warned that air ambulance providers "have become accustomed to threatening payors with the specter of balance-billing beneficiaries if their demands for payment are not met," and tells the adjusters "not acquiesce to this threat." (Ex. 1 to Pls.' Opp. to Mot. Summ. J.) He also stated that Eagle and Valley "will also notify the beneficiary and let them know they are on the hook for the [balance], in the hopes they will be scared into coercing their employer into paying the claim." (Id.)

Eagle and Valley admit to the unremarkable fact that they will sometimes balance bill beneficiaries. The underlying "gist" or "sting" of Sentinel's statements—that Eagle and Valley engage in the practice—is true.

As for Mr. Frazier's references to "threats" and "coercion," they must be read in context. While the words themselves can imply illegal, unethical, or dishonest conduct, they are common "colloquial or hyperbolic" terms that, though derogatory, often describe legitimate conduct. Hogan, 762 F.3d at 1108 (recognizing that the term "accused of extortion" is "a familiar rhetorical device," and does not always imply "a crime or similarly heinous conduct"). That is precisely how Mr. Frazier used the terms here, as "hyperbole and rhetorical flourish" to describe

(albeit uncharitably) the legitimate practice of balance billing.  Id.  His statements, read in proper context, do not carry a defamatory meaning.

## II.      Common Interest Privilege

Having determined that Sentinel made statements from which Eagle and Valley can sustain a defamation claim, the court turns to the question of privilege.  "Whether a statement is entitled to the protection of a conditional privilege presents a question of law; whether the holder of the privilege lost it due to abuse presents a question of fact."  O'Connor v. Burningham, 165 P.3d 1214, 1224 (Utah 2007).

Utah courts recognize a qualified privilege for statements "made to protect a legitimate interest of the publisher," and have extended the privilege to "statements made to advance a legitimate common interest between the publisher and the recipient of the publication." Brehany, 812 P.2d at 58–59.  Whether the common interest privilege protects communications between a consultant and consultee is something of an open question.  The parties have not cited, and the court has not found, a Utah case applying the privilege to this precise relationship.

Nonetheless, the court has little difficulty concluding that the privilege applies here. Generally, the privilege protects "communications between persons who share a common business interest."  Lind v. Lynch, 665 P.2d 1276, 1278 (Utah 1983).  Sentinel's allegedly defamatory statements all arose in the course of its relationship as a consultant to insurance companies and benefit plan administrators.  The claim adjusters have an interest in determining the reasonableness of billed healthcare charges for services such as medical transports, and in seeking assistance with claim disputes.  Likewise, Sentinel has an interest in providing data and

advice to claim adjusters.  These are legitimate business interests, and warrant application of the common interest privilege.

Eagle and Valley argue that the common interest privilege only applies to employer-employee relationships.  But Utah courts have not set forth any principles that would necessarily limit the privilege in such a way.  And federal courts applying Utah law have extended the privilege to communications between two different companies, a food broker and a food distributor, see Rowe v. DPI Specialty Foods, Inc., No. 2:13-CV-00708-DN, 2015 WL 3533844, at *3 (D. Utah June 4, 2015), and between two parties exploring a potential business relationship, see Thomas v. Pacificorp, 324 F.3d 1176, 1180 (10th Cir. 2003).  The court declines to limit the privilege as Eagle and Valley suggest.

Because the common interest privilege applies, Eagle and Valley must show that Sentinel abused the privilege, either by publishing the statements excessively or with malice.  Brehany, 812 P.2d at 58.

A.  Excessive Publication

Under Utah law "communications that are otherwise privileged lose their privilege if the statement is excessively published, that is, published to more persons than the scope of the privilege requires to effectuate its purpose."  DeBry v. Godbe, 992 P.2d 979, 985 (Utah 1999). Eagle and Valley have not presented evidence of excessive publication.   The parties do not seem to dispute that Sentinel sent claim review letters only to insurance companies and benefit plan administrators.  Instead, Eagle and Valley highlight various other statements that Sentinel made more broadly—for instance, a complaint Sentinel filed with the Federal Trade Commission about the air ambulance industry, and testimony that Sentinel may have derided Valley in

conversations with Munson Healthcare, a Michigan hospital that requested air ambulance transports. But these are not the precise statements that Eagle and Valley allege to be defamatory, and nothing in the record suggests that Sentinel sent claim review letters to anyone but consultees within the scope of the privilege.

B. Malice

Two types of malice constitute abuse of privilege, both of which are "distinct from the malice imputed in all defamatory statements." Brehany, 812 P.2d at 58 n.3. First, a statement may be published with common law, or ill-will, malice. A plaintiff must "plead[] and prove[] facts which indicate actual malice in that the utterances were made from spite, ill will or hatred toward him." Thomas, 324 F.3d at 1181 (quoting Combes v. Montgomery Ward & Co., 228 P.2d 272, 277 (1951)).

Second, a statement may be published with actual malice, which means that the defendant "(1) made a defamatory statement knowing it to be false or (2) acted in reckless disregard as to its falsity." Ferguson v. Williams & Hunt, Inc., 221 P.3d 205, 215 (Utah 2009). "To prove knowledge of falsity, a plaintiff must present evidence that shows the defendant knows the defamatory statement is untrue." Id. To prove reckless disregard of falsity, a plaintiff must show evidence of a defendant's subjective intent. "[R]eckless disregard as to falsity 'exists when there is a high degree of awareness of probable falsity or serious doubt as to the truth of the statement.'" Id. (quoting Restatement (Second) of Torts § 600 cmt. b (1977)).

Eagle and Valley have presented evidence from which a reasonable jury could find that Sentinel stated its profit margin calculations with common law malice. Mr. Frazier was apparently fired from an air ambulance company in 2009, and formed Sentinel to combat what

he saw as excessive billing practices in the air ambulance industry. He described billing practices as "profane," and viewed the noncompetitive nature of the air ambulance industry with disdain. (Dep. of J. Frazier, Ex. 24 to Pls.' Opp. to Mot. Summ. J. (ECF No. 194:7–19.) A dispute of fact exists as to whether any defamatory implications of overbilling were made in good faith, or as a consequence of Mr. Frazier's antipathy towards air ambulance companies. Additionally, there is evidence in the record to suggest that Sentinel implied self-referral between Eagle and the Blanding hospital with actual malice. Mr. Frazier testified that he made the statement without any knowledge that Eagle had engaged in the practice. Sentinel is not entitled to summary judgment on Eagle and Valley's defamation claim on grounds of privilege.

Because Eagle and Valley have presented evidence to support their defamation claim, their claim of tortious interference with economic relations survives as well.

**False Light**

The tort of false light invasion of privacy is closely related to defamation. "Both defamation and false light invasion of privacy provide legal redress for uninvited notoriety grounded in falsehoods caused by the defendants." <u>Jensen</u>, 130 P.3d at 335. But false light invasion of privacy is distinct in material ways, including in its publicity requirement.

Utah courts follow the definition of false light given by the Restatement (Second) of Torts:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> > (a) the false light in which the other was placed would be highly offensive to a reasonable person, and

> (b) the actor has knowledge of or acted in reckless disregard
> as to the falsity of the publicized matter and the false light in
> which the other would be placed.

Russell v. Thomson Newspapers, Inc., 842 P.2d 896, 907 (Utah 1992) (quoting Restatement (Second) of Torts § 652E (1977)).  The Restatement's "publicity" requirement differs from the "publication" requirement for the tort of defamation.  See Restatement (Second) of Torts § 652D cmt. a (1977).  For a false light claim, publicity "means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge."  Id.  "Examples would include newspapers, magazines, handbills to a large number of people or a statement made to a large audience."  Jones v. U.S. Child Support Recovery, 961 F. Supp. 1518, 1521 (D. Utah 1997).

Sentinel only sent the allegedly false communications in this case to the insurance companies and benefit plan administrators with which it was consulting.  Eagle and Valley have not produced evidence to show that Sentinel disseminated the statements at issue more broadly, let alone to the public at large or in a manner that would lead to public dissemination.  Eagle and Valley's false light claim fails as a matter of law.

**Causation and Damages**

Sentinel challenges all of Eagle and Valley's claims on grounds that its statements did not cause Eagle and Valley harm, and that Eagle and Valley have not presented evidence of economic damages.  According to Sentinel, its statements about Eagle and Valley's high billed charges merely echoed the opinions that claim handlers already held, and so caused no reputational harm.  Sentinel also argues that Eagle and Valley had no contractual or other right

under benefit plans to collect the full billed amount, and assumed the risk that insurers and plan administrators would deny claims or reimburse only part of the bill.

The court first notes that the allegedly defamatory statements imply overbilling and self-referral, "conduct which is incongruous with the exercise of a lawful business"; as a consequence, the claim is one of defamation per se. Jacob v. Bezzant, 212 P.3d 535, 545 (Utah 2009) (quoting Larson v. SYSCO Corp., 767 P.2d 557, 560 (Utah 1989)). For a claim of defamation per se, the court presumes the occurrence of at least nominal harm. Westmont Mirador, LLC v. Miller, 362 P.3d 919, 921 (Utah Ct. App. 2014) (defamation per se is a "procedural mechanism that relieves a plaintiff of its burden of proving damages as an element of its prima facie case"). Eagle and Valley's defamation claim survives summary judgment for this reason alone.

As for causation, Eagle and Valley have presented evidence from which a reasonable jury could infer that Sentinel's statements caused actual harm. At least some of the claim adjusters who received claim review letters testified that they had little preexisting knowledge about air ambulance charges and relied on Sentinel's letters to determine reimbursement amounts. Additionally, the payors sometimes quoted the review letters verbatim when they denied full payment, and offered exactly the amount Sentinel recommended.

Eagle and Valley have also presented evidence from which a jury could calculate actual damages. "[U]nder Utah law, in order to receive damages, plaintiffs 'must demonstrate the amount of damages with sufficient certainty to permit the factfinder to make an award, although the damages need not be proven with precision.'" Terry v. Hinds, 47 F. Supp. 3d 1265, 1276 (D. Utah 2014) (quoting Turtle Management, Inc. v. Haggis Management, Inc., 645 P.2d 667, 670

(Utah 1982)).  Eagle and Valley rely on the difference between their billed charges and the actual payments they received.  They have also calculated the typical percentages they received on billed charges from commercial insurers, which provides a general baseline of expected payments.  From this evidence, a jury could calculate damages.

Sentinel does raise a valid concern with Eagle and Valley's theory of causation and damages.  Each claim review letter amounts to a separate "statement" for the purpose of defamation liability.  Each claim and reimbursement amount will vary, and Sentinel may have additional claim-specific evidence to undercut causation and damages on a letter-by-letter basis.  But the parties have not discussed the claim review letters (or corresponding evidence) with this kind of specificity.  And for the purpose of summary judgment, the court need not determine the precise contours of all available damages.  See id. at 1276–77 (recognizing that such disputes "may be resolved as motions in limine prior to trial, or at the close of the Plaintiffs' evidence at trial").  Because Eagle and Valley have produced evidence supporting a theory of causation and at least some measure of damages, their defamation and tortious interference claims survive summary judgment.

### ERISA Preemption

Lastly, the court addresses Sentinel's argument that ERISA preempts Eagle's state law claims because the claims arise from employer-sponsored benefit plans governed by the statute.  ERISA's preemption provision directs that it "shall supersede any and all State laws insofar as they may now or hereafter relate to any [ERISA plan]."  29 U.S.C. § 1144(a).  The provision "was intended to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with

conflicting directives among States or between States and the Federal Government." Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 142 (1990).

"The pre-emption clause is conspicuous for its breadth." FMC Corp. v. Holliday, 498 U.S. 52, 58 (1990). "Its deliberately expansive language was designed to establish pension plan regulation as exclusively a federal concern." Ingersoll-Rand, 498 U.S. at 138 (internal citations and quotation marks omitted). In particular, Congress used the words "relate to" "in their broad sense, rejecting more limited pre-emption language that would have made the clause applicable only to state laws relating to the specific subjects covered by ERISA." Id. (internal quotation omitted).

> A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan. Under this broad common-sense meaning, a state law may 'relate to' a benefit plan, and thereby be pre-empted, even if the law is not specifically designed to affect such plans, or the effect is only indirect.

Id. at 139 (internal citations and quotation marks omitted); see also Settles v. Golden Rule Ins. Co., 927 F.2d 505, 509 (10th Cir. 1991) (state law tort claims "are preempted by ERISA if the factual basis of the cause of action involves an employee benefit plan").

In their Opposition, Eagle and Valley dispute Sentinel's conclusions that billed charges were not "reasonable" and that transports were not "medically necessary." These are defined terms in ERISA benefit plans, and cannot form the basis of a state law defamation claim. To determine truth or falsity, the court would need to define the terms and essentially resolve the claim for benefits, a task that risks "the potential for conflict in substantive law." Ingersoll-Rand, 498 U.S. at 142.

But, as discussed above, Sentinel's medical necessity conclusions do not amount to actionable defamatory statements. And though Eagle and Valley take issue with Sentinel's conclusions that billed charges were "not reasonable," Eagle and Valley do not appear to base their claims on these particular statements. (See Pls.' Opp. to Mot. Summ. J. at 41–42 (listing allegedly defamatory statements).)

The actionable statements in this case—Sentinel's profit margin calculations and its suggestion of self-referral—are only incidentally related to ERISA plans. A jury can resolve the defamation and tortious interference claims without reference to the terms of the plans, and without affecting "relations among the principal ERISA entities—the employer, the plan, the plan fiduciaries, and the beneficiaries." Airparts Co. v. Custom Ben. Servs. of Austin, Inc., 28 F.3d 1062, 1065 (10th Cir. 1994) (quoting Nat'l Elevator Indus., Inc. v. Calhoon, 957 F.2d 1555, 1559 (10th Cir. 1992)).

## ORDER

For the foregoing reasons, Sentinel's Motion for Summary Judgment (ECF No. 206) is GRANTED IN PART AND DENIED IN PART as follows:

1. Sentinel's statements in claim review letters concerning profit margins and self-referral can form the basis for Eagle and Valley's defamation and tortious interference claims; the other statements alleged to be defamatory cannot;

2. Eagle and Valley's claim of false light is dismissed;

3. the common-interest privilege applies to Eagle and Valley's remaining claims; and

4. ERISA does not preempt Eagle and Valley's remaining claims.

DATED this 30th day of August, 2019.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge